IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| JAMES HARDEN, | ) | |
| | ) | |
| Plaintiff, | ) | No. 12-cv-8316 |
| | ) | |
| v. | ) | |
| | ) | |
| Illinois State Police Officers TASSO J. | ) | |
| KACHIROUBAS, JOHN MEDUGA, | ) | |
| WILLIE DAVIS, JAMES KIZART, | ) | |
| JESSE GARCIA, RICHARD | ) | |
| PACKERT, Former Dixmoor Lt. | ) | |
| JOSEPH FALICA, JR., Former | ) | |
| Dixmoor Deputy Chief of Police | ) | |
| MICHAEL R. MORGAN, | ) | |
| Former Dixmoor Chief of Police | ) | |
| NICHOLAS GRAVES, VILLAGE OF | ) | |
| DIXMOOR, As-yet Unknown Current | ) | |
| or Former Employees of the Illinois | ) | |
| State Police, and As-yet Unknown | ) | |
| Current or Former Employees of the | ) | |
| Village of Dixmoor, Illinois, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff, JAMES HARDEN, by his attorneys, Loevy & Loevy, complains

against the Defendants, Illinois State Police Officers TASSO J. KACHIROUBAS,

JOHN MEDUGA, WILLIE DAVIS, JAMES KIZART, JESSE GARCIA, SPECIAL

AGENT RICHARD PACKERT, Former Dixmoor Lt. JOSEPH FALICA, JR., Former

Dixmoor Deputy Chief of Police MICHAEL R. MORGAN, Former Dixmoor Chief of

Police NICHOLAS GRAVES, VILLAGE OF DIXMOOR, As-yet Unknown Current

or Former Employees of the Illinois State Police, and As-yet Unknown Current or

Former Employees of the Village of Dixmoor, Illinois, as follows:

## Introduction

1.      James Harden spent 19 years in prison for a crime he did not commit.

2.      Along with his co-defendants, Jonathan Barr, Robert Taylor, Robert Veal and Shainne Sharp, James Harden was wrongfully convicted for allegedly raping and murdering a 14-year-old girl, Cateresa Matthews. Mr. Harden was sentenced to spend 120 years in prison. Mr. Harden and his co-defendants were all between 14 and 16 years of age at the time Ms. Matthews was murdered.

3.      The only evidence against Plaintiff came from "confessions" coerced by Defendant Officers implicating Plaintiff, who steadfastly maintained his innocence throughout.

4.      None of the teenagers had anything to do with this horrible crime. DNA analysis has since proved that the true perpetrator of Ms. Matthews' rape and murder was a then-33-year-old convicted sex-offender Willie Randolph, a stranger to Mr. Harden and his co-defendants. Randolph lived about a mile from the field where Ms. Matthews' body was found in Dixmoor, Illinois, and had raped another young woman in the exact same field. But despite the evidence implicating Randolph, he was not brought to justice. Tragically, Randolph went on to commit numerous other violent crimes throughout the Chicago area.

5.      Instead, the Defendant Officers created a false case against James Harden, his brother Jonathan, and the other teens. Focusing first on a 15 year-old special education student whose developmental disabilities were so severe that he had been removed from his public school, Defendant Officers coerced and fabricated

2

three confessions from young teenagers implicating Mr. Harden and the other teens. Although Defendant Officers attempted to coerce Mr. Harden, as well, he steadfastly maintained his innocence.

6.      Not only was there no forensic evidence—fingerprints, serology, DNA or other physical evidence of any kind—linking Mr. Harden or any of the other teens to the Matthews rape/murder, but DNA evidence at the time of trial excluded Mr. Harden and his co-defendants. However, the force of Defendant Officers' misconduct was enough to secure a conviction despite the objective evidence indicating innocence.

7.      Years later, Mr. Harden and his co-defendants were exonerated when new DNA evidence established that Willie Randolph was the source of the semen recovered in the rape kit collected during Ms. Matthews' autopsy. Moreover, the confessions fabricated by the Defendants asserted that the victim had been killed weeks before her body was found. Scientific testing demonstrated that the victim had to have been killed much closer to the time that her body was found.

8.      After the coerced "confessions" were proven false, the prosecution agreed to vacate Mr. Harden's conviction and dismiss all charges against him. On April 17, 2012, without opposition from the prosecution, Mr. Harden was granted a certificate of innocence from the State of Illinois.

9.      Through this civil rights action, Mr. Harden, now a 37 year-old man, seeks accountability and compensation for losing more than half of his life to Defendants' misconduct, including the most formative and vibrant years of a man's

life, when he would have otherwise been graduating from high school, pursuing a career, and starting a family. Both of Mr. Harden's parents died while he was incarcerated.

## Jurisdiction and Venue

10.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

11.     This Court has jurisdiction over federal claims pursuant to 28 U.S.C. § 1331 and state law claims pursuant to 28 U.S.C. § 1367.

12.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district and Defendant Village of Dixmoor is a municipal corporation located here. Additionally, the events giving rise to the claims asserted herein occurred within this judicial district.

## The Parties

13.     Plaintiff James Harden is 37 years-old. At the time of the victim's murder, Mr. Harden was just 16 years-old and a student at Pace High School in Blue Island, Illinois.

14.     At all relevant times, Defendants Tasso J. Kachiroubas, John Meduga, Willie Davis, James Kizart, Jesse Garcia, and Richard Packert were officers with the Illinois State Police employed by the State of Illinois and acting within the scope of their employment and under color of law.

15.     At all relevant times, Defendants Joseph Falica, Jr., Michael R. Morgan, and Nicholas Graves were employed by the Village of Dixmoor with the Dixmoor Police Department and acting within the scope of their employment and under color of law.

16.     Defendants Kachiroubas, Meduga, Davis, Kizart, Garcia, Packert, Falica, As-yet Unknown Current or Former Employees of the Illinois State Police, and As-yet Unknown Current or Former Employees of the Village of Dixmoor, Illinois, are referred to collectively as the "Defendant Officers."

17.     The Defendant Village of Dixmoor is a municipal corporation under the laws of the State of Illinois.

### The Matthews Murder

18.     On November 19, 1991, 14 year-old Cateresa Matthews disappeared on her way home from her grandmother's house.

19.     Tragically, Ms. Matthews was raped and murdered by Willie Randolph, a 33 year-old convicted sex offender on parole who lived nearby and had only recently been released from prison.

20.     On December 8, 1991, 19 days after she disappeared, Ms. Matthews' body was discovered by a passerby in a grassy field near I-57 in Dixmoor, Illinois. She was found naked from the waist down and had been shot in the mouth.

21.     The Illinois State Police and the Dixmoor police jointly investigated Ms. Matthews' murder. In keeping with standard police practices, Defendants withheld many details about the murder from the public so that they could use

these details to test the veracity of any eventual confession. These details included the precise position of Ms. Matthews' body, the clothing she was wearing (and what clothing had been taken off her body) and the specific location of her injuries.

22.     In the immediate aftermath of the murder, the Defendant Officers interviewed friends, relatives, and classmates of Ms. Matthews. They learned no information that implicated Mr. Harden or his eventual co-defendants.

### The True Killer and Rapist Is Not Pursued

23.     The Defendant Officers had a viable suspect in the true perpetrator, Willie Randolph, a convicted rapist and serial violent offender from Dixmoor, but either suppressed the information they found or inexplicably ignored evidence suggesting his guilt.

24.     Among the evidence that Defendant Officers ignored and/or suppressed was the fact that Randolph lived about a mile away from where Ms. Matthews was found. Randolph, who had served time for rape, deviate sexual assault, and armed robbery, was paroled earlier in 1991 not long before Ms. Matthews was raped and killed. He reported his address as 1809 W. 142nd Street in Dixmoor.

25.     Randolph, who was nearly 20 years older than Ms. Matthews, had previously used the exact same field where Ms. Matthews was raped and murdered to rape another young teen. He also had a history of other violent assaults on young women.

26.     On March 8, 1992, when no arrests had been made in Ms. Matthews' murder and rape, the Dixmoor Police Department arrested Randolph for possession

of crack cocaine after he was found wandering through the street disrupting traffic not far from where Ms. Matthews' body was found. On information and belief, the arresting officers ran his criminal history, revealing his past convictions as a violent sex offender and his parole date shortly before Ms. Matthews disappeared.

27.    None of this information was ever disclosed to Plaintiff or his co-defendants before their criminal trials.

28.    In the years that followed, Randolph was arrested for assaulting his niece and for aggravated assault with a deadly weapon after he attacked his girlfriend with a knife. He was later arrested and convicted for several drug offenses and residential burglaries.

## The False Case Against Plaintiff

29.    At the time of Ms. Matthews' murder, Mr. Harden was 16 years-old and living in Dixmoor with his parents and two brothers. He was attending Pace High School, did not know the true perpetrator Willie Randolph, and had nothing to do with Ms. Matthews' disappearance or murder. He and Ms. Matthews had been friends.

30.    At some point in the course of their investigation, the Defendant Officers learned that, several summers earlier, Mr. Harden had dated Ms. Matthews when they were kids. Despite the lack of any evidence linking Mr. Harden to the crime, the Defendant Officers focused their attention on him.

31.    Several months after Ms. Matthews' body was found, Defendant Officers picked up seven or eight of the neighborhood boys, including Mr. Harden

and his brother Jonathan. The boys were taken to the Dixmoor Police Station and questioned separately about the murder by Defendant Officers. Defendant Officers did not notify the boys' parents of these interviews and the parents were not present. Both Mr. Harden and Jonathan truthfully insisted that they knew nothing about the murder and assault. Defendant Officers withheld all documentation of these interviews from the reports made available to the prosecution and Mr. Harden's defense team.

32.      During the 10 months after Ms. Matthews' body was found, Defendant Officers routinely picked up and questioned teenage boys from the area without notifying their parents and without documenting the interviews. Several of the other eventual co-defendants, including Shainne Sharp, were picked up for questioning during this time period. Each insisted that he knew nothing about the killing and that none of the boys eventually charged with the crime knew anything about the murder. Defendants withheld their documentation of these interviews depicting the boys' insistence that they knew nothing about the killing from the reports produced to the prosecution and Mr. Harden's defense team.

33.      After several months of unsuccessful efforts with Jonathan and other teenage boys, the Defendant Officers manufactured "evidence" that falsely implicated Mr. Harden and his brother Jonathan. This fabrication of evidence included, but was not limited to, unlawfully manipulating witnesses to falsely implicate Mr. Harden and Mr. Barr by means of outright coercion and improper suggestiveness, and feeding these witnesses nonpublic facts to include in their

8

statements, all in violation of Plaintiff's constitutional rights. The means by which the Defendant Officers coerced these false statements implicating Mr. Harden were never disclosed to him. The Defendant Officers falsely reported that the nonpublic information in these statements had originated with the witnesses, and concealed that they had actually fed this information to the witnesses. The Defendant Officers also fabricated other statements of witnesses in police reports and withheld other exculpatory evidence.

34.     To that end, at some point after Ms. Matthews' body was found, the Defendant Officers took 15 year-old Keno Barnes, another schoolmate of Ms. Matthews, down to the police station. The Defendant Officers questioned Mr. Barnes, asking what he knew about the murder; he told them that he knew nothing. They persisted with questions about Mr. Harden, Jonathan Barr, and Shainne Sharp. Mr. Barnes continued to tell them that he knew nothing about the murder.

35.     In October 1992, Defendant Officers falsely reported that Mr. Barnes stated that Jonathan Barr claimed to have seen Ms. Matthews get in a car with Robert Veal, Robert Taylor, and some other boys, and that this was the last time Mr. Barr ever saw Ms. Matthews. This was a fabrication. Jonathan never said anything like this to Keno Barnes, and Keno Barnes did not provide this information to the Defendant Officers. Defendant Officers never disclosed to the prosecution or the defense that they had fabricated this statement. Further, the Defendant Officers never produced Barnes' truthful exculpatory statements to Plaintiff or the other teenage co-defendants.

36.     On or about October 29, 1992, Defendant Officers picked up 15 year-old Robert Veal from his home, cuffed and frisked him, and took him to the Markham courthouse for questioning. Defendants told him that they wanted to question him about a murder that happened in Dixmoor.

37.     At the time of Mr. Veal's interrogation, he was a mentally challenged and learning-disabled 15 year-old with an IQ of 56, who had difficulties with reading, writing and comprehension that required him to be removed from public school and attend special education classes; suffered from anxiety disorders; and had deafness in his right ear.

38.     That Robert Veal was a mentally challenged and learning-disabled 15 year-old was obvious to those who questioned him. But his intellectual and age-based limitations did not deter Defendant Officers from questioning him without a lawyer, parent, guardian, or any other representative during his entire unrecorded interrogation. Over the course of several hours, Defendant Officers yelled at Robert Veal, threatened him, and coerced him to implicate himself, Mr. Harden, Jonathan Barr, Robert Taylor, and Shainne Sharp in the rape and murder of Ms. Matthews.

39.     As a result of this improper and undue pressure, inflicted on a mentally challenged 15 year-old, Robert Veal falsely implicated himself, Mr. Harden, Robert Taylor, Jonathan Barr, and Shainne Sharp in the rape and murder of Ms. Matthews. The facts contained in that false confession were fed to him by the Defendant Officers.

40.     This included nonpublic facts about the crime, such as: that Ms. Matthews was killed in a field near the expressway, that she was wearing a Chicago Bulls jacket, which was pulled off during the assault, that her jeans were pulled off during the assault, that she was shot in the face, and that she had been wearing a ring and a bracelet. Defendant Officers falsely reported that these details had originated with Robert Veal and suppressed that they had supplied this information to him, as well as the coercion they had used to obtain the statement.

41.     Defendant Officers handwrote a false statement that Mr. Veal ultimately signed.

42.     Robert Veal was innocent of the Matthews murder. He would never have falsely implicated Mr. Harden, himself, and the others but for the Defendants' misconduct.

43.     Later on the day of October 29, 1992, then 15 year-old Robert Taylor was interrogated by Defendant Officers under similar circumstances to the interrogation of Robert Veal. Defendant Officers physically abused, yelled at, threatened, and coerced Robert Taylor into falsely implicating himself, Mr. Harden, Jonathan Barr, Shainne Sharp, and Robert Veal in the crime.

44.     As a result of this improper and undue pressure, inflicted on a 15 year-old boy, Robert Taylor falsely implicated himself and the others in the crime. The facts contained in the confession were fed to him by Defendant Officers. Robert Taylor would not have falsely implicated Mr. Harden but for Defendants' misconduct.

11

45. Robert Taylor was innocent of the Matthews murder. He would never have falsely implicated Mr. Harden, himself, and the others but for the Defendants' misconduct.

46. To further build the false case against Mr. Harden, Defendant Officers coerced and fabricated a false statement from Shainne Sharp on or about October 30, 1992, implicating himself, Mr. Harden, and the other boys in Ms. Matthews' rape and murder. Shainne Sharp was 17 years-old at the time, and the Defendant Officers refused to allow him to call his mother, grandmother, or an attorney.

47. As a result of this improper and undue pressure inflicted on him, Shainne Sharp falsely implicated himself and the others in the crime. The facts contained in the confession were fed to him by Defendant Officers, including the description of the field where the rape and murder occurred and that Ms. Matthews had been shot in the face.

48. Shainne Sharp was innocent of the Matthews murder. He would never have falsely implicated Mr. Harden, himself, and the others but for the Defendants' misconduct.

49. Based solely on this fabricated evidence, Plaintiff and his co-defendants were prosecuted for the Matthews rape and murder.

50. Defendant Officers also sought, unsuccessfully, to coerce and/or fabricate statements from Mr. Harden and Jonathan Barr. They interrogated them separately, outside the presence of their parents or lawyers, and without reading them their rights. Defendant Officers yelled and screamed at Mr. Harden. While

Mr. Barr was handcuffed to a wall, he was hit on the back of the head and instructed to tell what had happened to Ms. Matthews. When Mr. Barr truthfully denied knowing anything, Defendant Officers insisted he confess what had happened, yelling and screaming at him. They told him—falsely—that Mr. Harden had confessed and implicated him. Defendant Officers showed Mr. Harden and Mr. Barr disturbing crime scene and autopsy photos of Ms. Matthews.

51.     Although Mr. Harden and Jonathan Barr never told them anything about the crime, Defendant Officers prepared handwritten statements for each of them and put the statements in front of them, telling each of them that if they signed it, they could go home. Defendant Officers would not let them read the statements. Despite Defendant Officers' coercive tactics and their young age, Mr. Harden and his brother were able to stand firm. Plaintiff and Jonathan refused to sign the statements. They consistently and truthfully maintained their innocence of this horrific crime at all times.

### Forensic Evidence Excludes Plaintiff

52.     No physical or forensic evidence ever linked James Harden or any of his co-defendants to the crime. Rather, the physical evidence excluded the five teenagers.

53.     In October 1993, a forensic scientist from the Illinois State Police examined the numerous hairs found on the victim's body and clothes and excluded Mr. Harden and his co-defendants as the source of those hairs. A number of the

hairs did not match the victim either. This information was reported to Defendant Kachiroubas.

54.     Additionally, a bullet casing was found on Ms. Matthews' chest and a bullet was recovered from her body. Neither was ever linked to Mr. Harden or any of his teenage co-defendants.

55.     In early 1994, the Illinois State Police crime lab tested sperm on the vaginal and rectal swabs from the victim. Although the statements attributed to Robert Veal, Robert Taylor and Shainne Sharp collectively claimed that Ms. Matthews had been vaginally raped by all five co-defendants, the DNA testing on the sperm identified a single source male DNA profile which excluded Mr. Harden and all of his co-defendants as the source of the semen. In June 1994, the lab made a full report of the exclusion to Defendant Kachiroubas and other Defendant Officers.

56.     Defendant Officers ignored this critical evidence indicating that all of the teenagers were innocent of the Matthews rape and murder, and that the statements from Sharp, Veal, and Taylor were all false. They either failed to investigate other leads—such as the true perpetrator, Willie Randolph, a convicted sex offender who had recently been paroled into the neighborhood where Ms. Matthews' body was found and was arrested for possession of a firearm months later—or suppressed the exculpatory information they uncovered.

57.     Most importantly, despite this exonerating evidence, Defendant Officers continued to misrepresent the circumstances under which they had

14

obtained the statements from Sharp, Veal, and Taylor, concealing the coercion they had used. They also falsely represented that the details about the crime, including nonpublic details, originated with Sharp, Veal, and Taylor, when in reality these details had been supplied by Defendant Officers.

## The Wrongful Conviction

58.     In May 1995, Mr. Harden stood trial for the rape and murder of Cateresa Matthews.

59.     The false, fabricated, and coerced testimony of Robert Veal and Shainne Sharp was the only evidence presented against Mr. Harden at his trial.

60.     At trial, the prosecutors highlighted Veal and Sharp's statements. The prosecution specifically argued that the nonpublic details about the crime that Veal and Sharp provided in their statements showed that they committed the crime with Mr. Harden because these details could not have been known to them otherwise.

61.     As a complaining witness, Defendant Kachiroubas also testified falsely at Mr. Harden's criminal trial about Mr. Harden's purported guilt and about the veracity of the other witnesses' prior statements.

62.     No physical evidence ever linked Mr. Harden to the crime. In fact, the prosecution rested entirely on these false and fabricated statements that were contradicted by the physical evidence. Any additional evidence that would have undermined those statements would have changed the outcome of Plaintiff's trial.

63.     As a proximate result of the above-described misconduct on the part of the Defendants, the jury convicted Mr. Harden of the rape and murder of Ms.

Matthews. But for the Defendants' misconduct, Mr. Harden would have been neither prosecuted nor convicted.

64.     On September 15, 1995, Mr. Harden was sentenced to 120 years in prison.

### Plaintiff's Exoneration

65.     Throughout his prosecution and incarceration, Mr. Harden maintained his innocence and pursued all possible avenues to prove it.

66.     In August 2009, Mr. Harden filed a motion for post-conviction DNA testing, which was later joined by Robert Taylor and Jonathan Barr.

67.     Cellmark Laboratories in Dallas, Texas conducted the DNA testing and obtained a single male DNA profile from the vaginal swab extracts collected from Ms. Matthews post-mortem.

68.     DNA testing excluded Mr. Harden and the other four persons supposedly involved in the crime. Despite the "confessions" claiming that all five co-defendants had intercourse with the victim, the testing revealed only a single male DNA profile.

69.     In March 2011, the Illinois State Police submitted the DNA profile to the Combined DNA Index System (CODIS) database, which returned a match to the DNA profile of Willie Randolph, the convicted sex offender with a long and violent criminal history who at the time of the murder had recently been paroled from prison to the neighborhood where the victim's body was found.

70.     On November 3, 2011, the Cook County State's Attorney's Office requested the Cook County Circuit Court to vacate the convictions of Mr. Harden, Jonathan Barr, and Robert Taylor and *nolle prosequi* future charges. The court vacated all of these convictions. Shortly thereafter, the court also vacated the convictions of Robert Veal and Shainne Sharp.

71.     On April 17, 2012, the State of Illinois granted Mr. Harden a certificate of innocence without objection from the prosecution.

### Plaintiff's Damages

72.     The actions of Defendants caused Mr. Harden to spend 19 years in prison for a crime he did not commit. He must now attempt to make a life for himself outside of prison without the benefit of nearly two decades of life experiences—including his adolescence and young adulthood—which normally equip adults for that task.

73.     Additionally, the emotional pain and suffering caused by losing these 19 formative years has been substantial. Mr. Harden was taken from his family when he was just 17 years-old. During his incarceration, Mr. Harden was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to graduate from high school with his friends, to share holidays, births, funerals, and other life events with loved ones, the opportunity to date, to fall in love, to marry, and to pursue a career, and the fundamental freedom to live his life as an autonomous human being. Both of his parents and his grandmother died

while he was incarcerated. Mr. Harden was denied the opportunity to attend their funerals.

74.    As a result of the foregoing, Mr. Harden has suffered tremendous damage, including but not limited to personal physical injuries, mental suffering, and loss of a normal life, all proximately caused by Defendants' misconduct. As a direct and proximate cause of Defendants' misconduct, Mr. Harden was continuously incarcerated from the time of his arrest to his exoneration in November 2011.

## Count I – 42 U.S.C. § 1983
## Violation of Due Process

75.    Each paragraph of this Complaint is incorporated as if restated fully herein.

76.    As described more fully above, all of the Defendant Officers, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

77.    In the manner described more fully above, the Defendant Officers individually, jointly, and/or in concert and in conspiracy, fabricated false reports and other evidence which caused the conviction of Plaintiff including specifically the statements attributed to Robert Veal, Shainne Sharp, Robert Taylor and Keno Barnes; this includes fabricating that the nonpublic information about the crime had originated with these witnesses, when it had actually been fed to them by the Defendant Officers.

78.     In the manner described more fully above, the Defendant Officers individually, jointly, and/or in concert and in conspiracy, deliberately withheld exculpatory and impeachment evidence—such as the police coercion and fabrication of witness testimony of co-defendants that resulted in fabricated witness testimony, prior statements by these witnesses contradicting their later statements and/or testimony, and the fact that the nonpublic information about the crime contained in the inculpatory witness statements had been provided by the Defendant Officers, not the witnesses. By failing to disclose this information, Defendant Officers violated their clearly established duty to report all material exculpatory and impeachment information to prosecutors.

79.     Absent Defendants' misconduct, the prosecution of Plaintiff could not and would not have been pursued, and Plaintiff would not have been convicted.

80.     The Defendant Officers' misconduct directly and proximately resulted in the unjust and wrongful criminal conviction of Plaintiff and his continuing wrongful imprisonment, thereby denying him his constitutional right to a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

81.     As a direct and proximate result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but not limited to loss of liberty, personal physical injuries, and emotional distress.

82.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

83.     The misconduct described in this Count was undertaken pursuant to the policy and practice of the Village of Dixmoor in that Dixmoor Police Department employees and agents regularly failed to disclose exculpatory evidence to criminal defendants, pursued wrongful convictions through profoundly flawed investigations and coerced testimony, and otherwise violated due process in a similar manner to that alleged herein. The above-described widespread practices, which were so well-settled as to constitute *de facto* policy in the Dixmoor Police Department, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

84.     Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because the Village of Dixmoor declined to implement sufficient training and/or any legitimate mechanism for oversight or punishment.

85.     The misconduct described in this Count was undertaken pursuant to the policy and practice of the Village of Dixmoor in that the constitutional violations committed against Mr. Harden were committed with the knowledge or approval of person(s) with final policymaking authority for the Village of Dixmoor, including but not limited to Nicholas Graves and Michael Morgan, and/or undertaken by a municipal agent with final policymaking authority for the Village of Dixmoor.

20

86.     The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above, including but not limited to personal physical injuries.

### Count II – 42 U.S.C. § 1983
### Failure to Intervene

87.     Each paragraph of this Complaint is incorporated as if restated fully herein.

88.     In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, one or more of the Defendant Officers stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

89.     As a direct and proximate result of the Defendant Officers' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including but not limited to loss of liberty, personal physical injuries, and emotional distress. These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

90.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

91.     The misconduct described in this Count was undertaken by employees of the Village of Dixmoor, including but not limited to the named Defendants,

pursuant to the Village of Dixmoor's policy and practice in the manner described in the preceding paragraphs.

## Count III – 42 U.S.C. § 1983
### Conspiracy to Deprive Plaintiff of His Constitutional Rights

92.     Each paragraph of this Complaint is incorporated as if restated fully herein.

93.     After the murder of Ms. Matthews, the Defendant Officers, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff of his constitutional rights, including his rights to due process and to a fair trial, all as described in the various paragraphs of this Complaint.

94.     Additionally, before and after Plaintiff's conviction, the Defendant Officers further conspired to deprive Plaintiff of exculpatory information to which he was lawfully entitled and which would have led to either his not being charged, his acquittal, or his more timely exoneration.

95.     In this manner, the Defendant Officers, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

96.     In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above—such as fabricating evidence, withholding exculpatory evidence, coercing false confessions, committing perjury during hearing and trials—and was an otherwise willful participant in joint activity.

97.     As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Plaintiff's rights were violated, and he suffered injuries, including but not limited to loss of liberty, personal physical injuries, and emotional distress.

98.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's rights.

99.     The misconduct described in this Count was undertaken by employees of the Village of Dixmoor, including but not limited to the named Defendants, pursuant to the Village of Dixmoor's policy and practice in the manner described in the preceding paragraphs.

### Count IV – 42 U.S.C. 1983
### Liability of Supervisors

100.     Each paragraph of this Complaint is incorporated as if restated fully herein.

101.     The unfair trial, wrongful conviction, and continued wrongful detention of James Harden were caused by the deliberate indifference and recklessness of supervisory defendants, including but not limited to Defendants Michael Morgan and Nicholas Graves, when they failed to adequately train and supervise the individual Defendant Officers.

102.     Specifically, these supervisory defendants were either personally involved in the case against Mr. Harden and knew or, in the absence of their

23

deliberate indifference and recklessness, should have known of their subordinates' unconstitutional actions and related misconduct in the case.

103.    Furthermore, these supervisory defendants failed to supervise the individual defendants in constitutionally adequate law enforcement practices, particularly those which concerned interviews of suspects and witnesses and production of exculpatory evidence, thereby encouraging and/or permitting these employees and other defendants to coerce and fabricate false inculpatory evidence and to withhold exculpatory and impeachment evidence, which caused the constitutional deprivations suffered by Plaintiff.

104.    These interview techniques, failures in producing exculpatory evidence, fabrications and other investigative procedures were contrary to accepted methods used by law enforcement agencies. The fact that the defendant supervisors failed to train and supervise their subordinates to ensure that they employed proper investigation procedures demonstrates deliberate indifference and reckless disregard for Plaintiff's constitutional rights.

105.    The actions and omissions of the supervisory defendants proximately and directly caused the constitutional deprivations and grievous personal injuries suffered by Plaintiff, including the above-mentioned personal physical injuries and damages.

106.    The misconduct described in this Count was objectively unreasonable, and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's clearly established constitutional rights.

107.    The misconduct described in this Count was undertaken by employees of the Village of Dixmoor, including but not limited to the named Defendants, pursuant to the Village of Dixmoor's policy and practice in the manner described in the preceding paragraphs.

### Count V – State Law Claim
### Malicious Prosecution

108.    Each paragraph of this Complaint is incorporated as if restated fully herein.

109.    The Defendant Officers accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

110.    The Defendant Officers caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in emotional, financial, and personal physical injuries.

111.    Statements of the Defendant Officers regarding Plaintiff's alleged culpability were made with knowledge that said statements were false and perjured. The Defendant Officers also fabricated evidence by coercing false inculpatory testimony from purported witnesses. The Defendant Officers were aware that, as described more fully above, no true or reliable evidence implicated Plaintiff in the Matthews rape/murder, all inculpatory evidence was coerced and fabricated, and forensic evidence indicated Plaintiff's innocence. Furthermore,

Defendant Officers intentionally withheld from and misrepresented to prosecutors and the grand jury facts that further vitiated probable cause against Plaintiff, as set forth above, and failed to investigate evidence which would have led to the actual perpetrator. The Defendant Officers withheld the facts of their manipulation and the resulting fabrications from Plaintiff.

112.    The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

113.    On November 3, 2011, the prosecution terminated in Plaintiff's favor when his conviction was vacated and the charges dismissed. On April 17, 2012, he was granted a Certificate of Innocence by the State of Illinois.

114.    As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, injuries as set forth above, including pain, suffering, and personal physical injuries.

## Count VI – State Law Claim
### Intentional Infliction of Emotional Distress

115.    Each paragraph of this Complaint is incorporated as if restated fully herein.

116.    The acts and conduct of the Defendant Officers as set forth above were extreme and outrageous. The Defendant Officers' actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

117.    As a direct and proximate result of the Defendant Officers' actions, Plaintiff suffered and continues to suffer severe emotional distress.

118.    Because the Defendant Officers acted within the scope of their employment with the Village of Dixmoor and the Illinois State Police, the Village of Dixmoor and the State of Illinois, respectively, are liable as their employers for any resulting damages and any award of attorneys' fees.

### Count VII – State Law Claim
### Civil Conspiracy

119.    Each paragraph of this Complaint is incorporated as if restated fully herein.

120.    As described more fully in the preceding paragraphs, the Defendant Officers, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

121.    In furtherance of the conspiracy, the Defendant Officers committed overt acts and were otherwise willful participants in joint activity including but not limited to the malicious prosecution of Plaintiff and the intentional infliction of emotional distress upon him.

122.    The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

123.    As a direct and proximate result of the Defendant Officers' conspiracy, Plaintiff suffered damages, including severe emotional distress and anguish, as is more fully alleged above.

## Count VIII – State Law Claim
### Respondeat Superior

124.     Each paragraph of this Complaint is incorporated as if restated fully herein.

125.     In committing the acts violating state law as alleged in the preceding paragraphs, each of the Defendant Officers were members of, and agents of, the Village of Dixmoor or the Illinois State Police, acting at all relevant times within the scope of their employment and under color of law.

126.     Defendant Village of Dixmoor is liable as principal for all violations of state law committed by its agents.

## Count IX – State Law Claim
### Indemnification

127.     Each paragraph of this Complaint is incorporated as if restated fully herein.

128.     Illinois law provides that public entities are directed to pay any tort judgment or settlement for compensatory damages for which employees are liable within the scope of their employment activities.

129.     The Defendant Officers are or were employees of the Village of Dixmoor or the Illinois State Police, who acted within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiff JAMES HARDEN respectfully requests that this Court enter judgment in his favor and against Defendants, Illinois State Police Officers TASSO J. KACHIROUBAS, JOHN MEDUGA, WILLIE DAVIS, JAMES KIZART, JESSE GARCIA, SPECIAL AGENT RICHARD PACKERT, Former Dixmoor Lt. JOSEPH FALICA, JR., Former Dixmoor Deputy Chief of Police MICHAEL R. MORGAN, Former Dixmoor Chief of Police NICHOLAS GRAVES, VILLAGE OF DIXMOOR, As-yet Unknown Current or Former Employees of the Illinois State Police, and As-yet Unknown Current or Former Employees of the Village of Dixmoor, Illinois, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

## JURY DEMAND

Plaintiff, JAMES HARDEN, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

/s/ Elizabeth Wang
One of Plaintiff's Attorneys

Arthur Loevy
Jon Loevy
Russell Ainsworth
Tara Thompson
Elizabeth Wang
LOEVY & LOEVY
312 N. May St., Ste. 100
Chicago, IL 60607
(312) 243-5900